UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| Poulin Holdings, LLC | |
| Plaintiff, | |
| v. | Civil Action No. 26-CV-245 |
| Databricks, Inc. | **JURY TRIAL DEMANDED** |
| Defendant, | |

## COMPLAINT

Plaintiff Poulin Holdings, LLC ("Poulin Holdings" or "Plaintiff"), through its undersigned counsel, hereby alleges the following against Defendant Databricks, Inc. ("Databricks" or "Defendant"):

## NATURE OF THE ACTION

1.    This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

## THE PARTIES

2.    Plaintiff Poulin Holdings, LLC is a New Hampshire limited liability company, with its principal office address at 155 Fleet Street, Portsmouth, New Hampshire 03801, USA.

3.    Defendant Databricks, Inc. is a corporation organized under the laws of the state of Delaware with its principal executive offices and corporate headquarters located at 160 Spear Street, San Francisco, California 94105. Databricks is registered to do business in Texas.  *See* TEXAS SECRETARY OF STATE, https://direct.sos.state.tx.us/ at Filing No. 804532217 (showing that Databricks has been registered since 2022 as a foreign corporation in Texas).

Databricks' registered agent in Texas is United Agent Group Inc. located at 5444 Westheimer #1000, Houston, TX 77056.

4.    Databricks was founded in 2013, and in September of 2023, announced a valuation of $43 billion dollars See Databricks Raises Series I Investment at $43B Valuation, DATABRICKS, https://www.databricks.com/company/newsroom/press-releases/databricks-raises-series-i-investment-43b-valuation. Over 50% of Fortune 500 companies use Databricks' platforms.

5.    Databricks provides data management and analytics via combining the best elements of data lakes and data warehouses to help you reduce costs and deliver on your data and AI initiatives faster, referred to as the "Databricks Lakehouse."  Databricks is "a unified, open analytics platform for building, deploying, sharing, and maintaining enterprise-grade data, analytics, and AI solutions at scale." *See* What is Databricks?, DATABRICKS, https://docs.databricks.com/en/introduction/index.html (last visited January 31, 2026).

6.    In 2020, Databricks introduced the "Lakehouse," which was based on open source data formats such as Apache Parquet, and Hadoop. *See* What is a Lakehouse?, DATABRICKS, available at https://www.databricks.com/blog/2020/01/30/what-is-a-data-lakehouse.html (Last visited on January 31, 2026). The Databricks Lakehouse is based on a variety of open-source data lake and data warehouse technologies such as Hadoop and Apache Parquet. See Lakehouse: A New Generation of Open Platforms that Unify Data Warehousing and Advanced Analytics?, MICHAEL ARMBRUST, available at https://www.cidrdb.org/cidr2021/papers/cidr2021_paper17.pdf (January 2021).

7.    The Databricks Lakehouse Platform includes several different products including at least Databricks SQL (a serverless data warehouse), Delta Lake, Unity Catalog, Databricks

Marketplace, and Data Intelligence Platform. *See* Databricks SQL, DATABRICKS,

https://www.databricks.com/product/databricks-sql (last visited on January 31, 2026); Unity

Catalog, DATABRICKS, https://www.databricks.com/product/unity-catalog  (last visited on

January 31, 2026); Databricks Marketplace, DATABRICKS,

https://www.databricks.com/product/marketplace (last visited on January 31, 2026); Data

Streaming, DATABRICKS, https://www.databricks.com/product/data-streaming (last visited on

January 31, 2026). The Data Intelligence Platform "integrates with cloud storage and security in

[the customer's] cloud account, and manages and deploys cloud infrastructure on" behalf of the

customer. See What is Databricks?, DATABRICKS,

https://docs.databricks.com/en/introduction/index.html (last visited January 31, 2026).

8.      The Databricks Lakehouse Platform and their components are utilized by

customers of Databricks across industries, including Energy, Financial Services,

Telecommunications, Technology, Advertising, and Healthcare and Life Sciences, among many

others. *See* Databricks for Industry, DATABRICKS, https://www.databricks.com/solutions (last

visited January 31, 2026); Industry Solutions, DATABRICKS,

https://www.databricks.com/solutions/accelerators (last visited January 31, 2026). Databricks

collects revenues and profits from the installation, licensing, and use of the Databricks

Lakehouse Platform. *See* Databricks Pricing, DATABRICKS,

https://www.databricks.com/product/pricing (last visited January 31, 2026).

9.      Databricks, for example, offers a "Pay as you go" pricing model where the price

is based on the Databricks Unit or "DBU". *See id*.

10.     Defendant Databricks on its own and/or via subsidiaries, distributors, and

affiliates maintains a corporate and commercial presence in the United States, including in

3

Texas and this District. Defendant maintains its business presence in the U.S. and Texas via at least the following activities: 1) distributing and providing its Databricks Platforms, among other products and services of Databricks, to customers; 2) maintaining an online presence (https://www.databricks.com) that solicits sales and sales inquiries of and provides customer support for Databricks products and services; 3) registering to do business in Texas; 4) employing persons across the world who support the development of products and services and provide customer support to U.S. residents and companies, and 5) employing persons in the United States, including residents of Texas and this District. For example, Defendant employs Texas residents in at least one location in the Plano, Texas area at 6900 Dallas Pkwy, Suite 02-106, Plano, Texas 75024. *See*, *e.g.*, Worldwide Locations, DATABRICKS, https://www.databricks.com/company/contact/office-locations  (showing Databricks locations in the U.S. and Texas). Thus, Defendant Databricks does business in the United States, the state of Texas, and in the Eastern District of Texas.

## JURISDICTION AND VENUE

11.    This Court has exclusive subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) on the grounds that this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285.

12.    This Court has personal jurisdiction over Defendant because Defendant has one or more regular and established places of business in this District, including a corporate office located at 6900 Dallas Pkwy, Suite 02-106, Plano, Texas 75024, where Defendant's employees work and additional employees are being hired. Defendant is registered to do business in Texas and maintains an agent for service of process in Texas.

13.     Defendant has purposefully directed activities at residents of Texas and this District, including by distributing, marketing, licensing, offering, and providing its products and services to customers in Texas and this District; maintaining an online presence through which it solicits sales, sales inquiries, and customer support; employing personnel in Texas and this District; and deriving substantial revenue from customers in Texas and this District. These activities relate to, and give rise to, the claims asserted in this action.

14.     Further, Defendant has committed acts of patent infringement in this District, and regularly conducts and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed and services provided in this District. Defendant has placed and continues to place the accused products and services into the stream of commerce with the knowledge and understanding that they are and will be used by customers in Texas and in this District.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b) because Defendant has committed acts of infringement in this District and has a regular and established place of business in this District, including the Plano, Texas office identified above.

16.     Defendant managed the marketing, sales, licensing, provisioning, and support of its products and services to customers and/or potential customers located in Texas and in this District, and Defendant's infringing acts have occurred in this District as alleged in this Complaint.

**PATENTS-IN-SUIT**

17.     On April 17, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,160,977 (the "'977 Patent"), entitled "Collaborative predictive model building." A true and correct copy of the '977 Patent will be attached hereto as **Exhibit A**.

18.     On April 14, 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,009,090 (the "'090 Patent"), entitled "Predictive model database with predictive model user access control rights and permission levels." A true and correct copy of the '090 Patent will be attached hereto as **Exhibit B**.

19.     Plaintiff is the sole and exclusive owner of all rights, titles, and interests in and to the U.S. Patent No. 8,160,977 and U.S. Patent No. 9,009,090 ("Patents-in-suit") and holds the exclusive right to take all actions necessary to enforce its rights in the Patents-in-suit, including the filing of this patent infringement lawsuit.

20.     Plaintiff also has the right to recover all damages for infringement of the Patents-in-Suit as appropriate under the law.

21.     The Patents-in-suit are directed to computer-implemented technologies for building, storing, searching, and governing access to predictive models. The '977 Patent is directed to techniques for estimating the probability that a future event will occur based on user input, including building predictive models from precursor data and storing such models in a searchable model database to permit user access. The '090 Patent, which is related to and continues from the same family as the '977 Patent, is directed to a predictive model database with predictive model user access control rights and permission levels.

22.     The '977 Patent generally covers a computer-implemented method for estimating a probability that a future event will occur based on user input, including decomposing a data input stream to build a database of precursor data used to build at least one predictive model; building at least one predictive model using the precursor data, with the model producing predictions of the likelihood of an event occurring in the future; storing the at least one predictive model in a second database that stores models, with the second database being searchable to

6

permit the stored model(s) to be accessed by users; and calculating accuracy of the at least one predictive model against historical data.

23.    The '090 Patent generally covers a computer-implemented, rights-conditioned access workflow for predictive models stored in a database, including storing a plurality of predictive models in a database, the models having permission levels that specify access rights to control user access; receiving and executing a search query to search the database and to produce search results that are provided based on search terms; sending the search results to a user system; receiving a selection of a model from the search results; and sending a message to the user system based on the access rights associated with the selected model, the message including at least one option enabling access to the selected model.

**FACTUAL ALLEGATIONS**

## I.    TECHNOLOGY BACKGROUND

24.    Predictive models are computer-implemented models trained from historical input data to generate predictions about future events, including predictions expressed as probabilities that a future event will occur. In practice, predictive modeling systems commonly ingest and transform raw batch and/or streaming data into structured precursor datasets (often called "features" or "feature tables") that are persisted for reuse across model-building workflows.

25.    Predictive modeling systems also commonly include a model repository or registry that stores trained models (often with versions) and permits users to discover, search for, retrieve, and deploy stored models through user interfaces and/or programmatic mechanisms. Such systems further commonly evaluate trained models against historical or ground-truth data, calculate performance metrics (including accuracy and related metrics), and log or present those results to enable comparison across models and model-training runs.

26.     In enterprise environments, model repositories and registries typically implement governance and access controls so that different users have different permission levels and access rights to view, search, retrieve, register, modify, and/or deploy particular models, and systems may condition what a user can do—or the options presented to the user—based on the user's rights associated with a selected model.

## II.     POULIN'S INNOVATIVE PREDICTIVE MODEL TECHNOLOGY

27.     The inventor of U.S. Patent No. 8,160,977 (the '977 Patent), entitled "Collaborative predictive model building," and U.S. Patent No. 9,009,090 (the '090 Patent), entitled "Predictive model database with predictive model user access control rights and permission levels," Christian D. Poulin, recognized that as organizations increasingly relied on predictive models, they faced computer-implemented problems that went well beyond simply running an algorithm: large and continually changing data streams needed to be processed into stable training datasets; multiple models and model versions needed to be stored in a manner that allowed users to find and reuse them; model quality needed to be calculated and tracked against historical ground truth; and access to models needed to be governed so that different users could discover models while only authorized users could actually obtain, use, or commercialize them.

28.     The claims of the Patents-in-Suit solved these problems and improved the technical field by disclosing a specific architecture and control flow for predictive modeling that (i) decomposes an incoming data input stream into a persisted first database of precursor data, (ii) generates predictive models using the precursor data and stores those models as distinct artifacts in a second database dedicated to models, (iii) makes the second database searchable to permit user discovery and access, (iv) calculates and persists model accuracy using historical

data, and (v) governs user access by associating models with permission levels and by providing rights-conditioned post-selection options that enable access consistent with the applicable rights.

### A.      U.S. Patent No. 8,160,977: Collaborative Predictive Model Building

29.     In 2006, the state of the art for predictive modeling was characterized by fragmented, ad-hoc workflows. Data was siloed, and there was no standardized, computer-implemented mechanism for decomposing data streams into structured precursor datasets that could be persisted and reused, while simultaneously registering the resulting models as first-class, searchable, and auditable artifacts. Predictive models were often "black box" processes, resulting in a lack of repeatability and difficulty in objectively comparing model quality.

30.     The '977 Patent solved these technical problems by disclosing a specific, non-conventional database architecture. This architecture mandates the use of two distinct, specialized databases: a first database to persist "precursor data" (features) and a second database dedicated to storing trained, searchable predictive models. This is not a mere "data storage" concept; it is an improvement to the fundamental data structure of the computer system, enabling the system to treat a model not as a static file, but as an auditable, comparable, and discoverable database record. By requiring the system to compute and persist accuracy metrics against historical data, the '977 Patent improves the computer's ability to manage model lifecycle and performance validation.

31.     The '977 Patent discloses a computer-implemented architecture that persistently stores precursor training data separately from trained predictive model artifacts, utilizing a first database for precursor data and a second database for model artifacts, thereby enabling independent storage, retrieval, and reuse of precursor datasets and trained models.

32.     Independent Claim 1 of the '977 Patent recites a computer-implemented method that converts an incoming data input stream into a first, persisted database of precursor data used for model training; builds at least one predictive model from that precursor data, with the model producing predictions regarding the likelihood of a future event; stores the trained model in a second database that is dedicated to models and is searchable so that users can locate and access stored models; and calculates an accuracy of the model against historical data.

33.     The '977 Patent's two-database architecture is not a generic storage concept. It separates the precursor datasets used to build and retrain predictive models from the trained models themselves. That separation makes model training repeatable and auditable because the precursor database preserves the datasets that were actually used to build a model, while the model database preserves the trained model artifact as a first-class record that can be independently searched, retrieved, and used without rebuilding it from scratch.

34.     The '977 Patent further describes user-driven model building through computer interfaces that prompt a user to select and configure inputs for model creation. By way of example, the patent describes prompting a user to select a project name and a categorization for a model; selecting and collecting data from one or more data sources; processing, normalizing, and formatting the collected data into a structured dataset; and then prompting the user to select model-building parameters including a model type, a target variable specification, a model name specification, access rights for the resulting model, discrete states of predictive ranges, and iterations. The system then builds the model and stores it for use by the user and, subject to the selected access privileges, by other users.

35.     In addition to storing models, the '977 Patent describes search and inference operations over the model database. A user can use a search engine to search a database of

models to find a model and can then query a found model to develop an inference of the likelihood of a future event. This turns the model database into a user-facing registry that supports discovery, reuse, and operationalization of predictive models. The patent also describes evaluating and refining predictive models, including testing and optimizing models to refine accuracy and calculating accuracy against historical data. The patent ties accuracy to the stored model so that models and model versions can be objectively compared based on performance measured against historical ground truth.

36.    The '977 Patent further describes publishing and controlled distribution mechanisms for models, including selecting access permissions for publishing a model and providing a market for use of models. The disclosed marketplace concept includes searchable models that can be made available to other users under different access conditions, including scenarios in which models are offered for commercial access and are advertised with relative pricing. The patent describes models offered for use in diverse areas, including health-related and genetic predictions, commodity price predictions, media and entertainment-related predictions, and political and behavioral predictions.

**B.    U.S. Patent No. 9,009,090: Permissioned Predictive Model Database**

37.    The '090 Patent, which is related to and continues from the same patent family as the '977 Patent, focuses on model-governance mechanics for a predictive model database. Consistent with the shared disclosure, the '090 Patent describes building and storing predictive models for community use as searchable items or, depending on access rights, maintaining models as private, restricted items.

38.    By 2012, while predictive models had become more prevalent in enterprise environments, the industry faced a governance "bottleneck." The state of the art lacked a

machine-governed way to manage access to the proliferation of these models. Existing systems were largely binary—access was either universally open or entirely closed—failing to provide a secure, rights-conditioned path for model discovery and operationalization.

39.    The '090 Patent provides a technical improvement by introducing a rights-conditioned access workflow directly into the database record. The invention enables the system to intelligently govern post-selection behavior; the computer does not simply display information, but rather executes a control-flow operation where the message returned to the user is dynamically determined by the permissions stored in the database. This requires the computer to synthesize user identity, access rights, and the model's "for-sale" or "private" status in real-time to generate enabling options—such as a "bid" or "request access" control—governing the subsequent transaction. This is a specialized improvement to computer security and governance mechanics that forces the machine to act as a gatekeeper of its own data records based on programmatic permission levels, a significant advancement over the "collect-analyze-display" patterns that characterize the prior art.

40.    By way of explanation, independent Claim 1 of the '090 Patent recites a rights-conditioned workflow in which the computer system stores a plurality of predictive models in a database as records associated with permission levels specifying access rights; receives and executes a search query against the model database; sends the resulting list of models to a user system; receives a user selection of a model from the search results; and then sends a message determined by the access rights associated with the selected model. The message includes at least one option enabling access to the selected model consistent with the user's rights.

41.    The rights-conditioned message-and-option step is a concrete computer-controlled access mechanism. It ties per-model permission levels to the post-selection behavior of the

system and governs whether and how access is enabled. By way of explanation, the system can enable immediate access for authorized users while presenting a different enabling option for users who lack permission and must take an additional step to obtain authorized access.

42.     The Patents-in-suit are directed to specific, computer-implemented improvements in how predictive models are stored, searched, evaluated against historical data, and governed through permission levels and rights-conditioned access options, rather than to a mere result or abstract concept. In appropriate circumstances, the Federal Circuit has held that claims focused on concrete improvements to computer functionality—such as specific improvements to computer data structures and database operation—can fall outside the "abstract idea" category, *see, e.g., Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327 (Fed. Cir. 2016), and that claims directed to particular computer-security techniques can likewise be patent-eligible, *see, e.g., Ancora Techs., Inc. v. HTC Am., Inc*., 908 F.3d 1343 (Fed. Cir. 2018).

43.     Even if individual steps such as storing, searching, or sending messages are viewed in isolation as conventional, the ordered combination recited by the Patents-in-Suit — including the two-database separation between precursor data and models, the searchable model registry for user access, the required calculation of accuracy against historical data, and the rights-conditioned post-selection access options — reflects a specific nonconventional arrangement of components and control flow that supplies an inventive concept under *Bascom*.

### C.     Databricks' Relevant Platform Components

44.     Databricks provides an integrated platform for data engineering, machine learning, and model deployment. Databricks provides tools and services for ingesting and processing data at scale, constructing feature datasets used for model training, training predictive models that produce likelihood-based predictions about future events, tracking model parameters

and training artifacts, calculating and persisting model evaluation metrics, registering and versioning models, and controlling user access to models and related assets.

45.    Databricks Feature Store provides a centralized mechanism to compute, store, and serve feature data used for predictive modeling. Feature Store transforms input data, including batch and streaming sources, into persisted feature tables that are reused across training and inference workflows. These persisted feature tables function as precursor datasets used to build and retrain predictive models.

46.    Databricks supports model-building processes that train predictive models using Feature Store feature tables and other precursor data and that produce predictions regarding the likelihood that future events will occur. Databricks integrates model training workflows with MLflow tracking so that model parameters, training artifacts, and metrics are captured and associated with particular model runs and model versions. By way of example, Databricks-supported machine learning workflows include classifier models (including logistic regression models) that output probabilities for each record as likelihood-based predictions.

47.    Databricks provides MLflow evaluation and related mechanisms to evaluate trained models against historical data. These workflows calculate, log, and compare accuracy and related performance metrics across runs using historical, ground-truth evaluation datasets, enabling side-by-side comparisons of models and model versions over time.

48.    Databricks provides a hosted model registry, including Models in Unity Catalog, that stores trained models and model versions as first-class objects in a database dedicated to models. Databricks provides interfaces to browse and search for registered models and versions, including through Catalog Explorer and MLflow search APIs for registered models and model versions, enabling users to discover and access stored models.

49.     Unity Catalog provides centralized governance for data and AI assets in Databricks, including model objects stored in the model registry. Unity Catalog associates models with access control policies and permission levels that specify access rights controlling which users can view, use, modify, or manage particular model records and model versions.

50.     Databricks Marketplace provides a searchable marketplace for data and AI assets, including assets related to predictive modeling. Marketplace permits users to search for available listings, view and select a particular listing, and then receive a rights-conditioned response that depends on the user's permissions and the provider's settings. After selection, the user is presented with one or more options to obtain authorized access, including request or subscription workflows, thereby enabling access consistent with applicable rights.

51.     Through these model lifecycle, governance, and marketplace features, Databricks provides the same type of computer-implemented architecture and workflows addressed by the Patents-in-Suit, including precursor data persistence, a searchable model database, calculation and persistence of historical accuracy metrics, permission levels controlling user access to models, and rights-conditioned post-selection options enabling access.

## III.     INFRINGEMENT ALLEGATIONS

52.     Databricks develops, provides, and operates a cloud-based platform that it markets as the Databricks Lakehouse Platform. Databricks makes the platform available to customers and users through web-based interfaces and programmatic interfaces, and Databricks operates the underlying computer systems that provide the platform's functionality.

53.     Databricks' platform includes integrated functionality for (i) creating and persisting "feature" datasets used to train predictive models, (ii) training predictive models that generate probability-based predictions of future events, (iii) registering and storing trained

models and model versions in a centralized, searchable model registry, (iv) evaluating models against historical datasets and calculating and logging model accuracy and related metrics, and (v) governing user access to model assets through permissions, including through Unity Catalog governance and controlled access flows available through Databricks Marketplace.

54.     As used in this Complaint, the Accused Products and Services include, without limitation, Databricks Feature Store, MLflow tracking and evaluation, MLflow Model Registry and/or Models in Unity Catalog, model discovery and search interfaces (including Catalog Explorer and model registry search capabilities), Unity Catalog governance and permissions as applied to model objects, and Databricks Marketplace, together with associated interfaces, APIs, workflows, and any functionally equivalent systems, platforms, or services that incorporate the claimed features of the Patents-in-Suit.

### A.    Feature Store, Model Registry, and Model Evaluation

55.     Databricks has infringed and continues to infringe U.S. Patent No. 8,160,977 (the "977 Patent") in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or providing within the United States, including in Texas and this District, the Accused Products and Services, which implement and perform methods that practice one or more claims of the '977 Patent, including at least Claim 1, either alone and/or in concert with its customers and end users through the operation of Databricks' platform.

56.     In particular, Databricks Feature Store is designed to compute, manage, and persist "features" used for machine-learning workflows. In operation, Databricks transforms incoming batch and/or streaming input data into structured feature tables and persists those feature tables for reuse across model training and inference. These persistent feature tables

constitute a database of precursor data used to build predictive models in the manner recited by the '977 Patent.

57.     Databricks provides model-building workflows that train predictive models using the persisted feature data. Databricks supports and enables training of models that generate probability outputs, i.e., predictions of the likelihood that a future event will occur, using the precursor data stored in the feature tables managed through Databricks Feature Store and associated Databricks data processing pipelines.

58.     Databricks provides MLflow-based model management and a hosted model registry, including MLflow Model Registry and/or Models in Unity Catalog, that stores trained models and model versions as distinct model records. Databricks stores trained predictive models in this hosted model registry as a second database that stores models separate from the precursor feature data.

59.     Databricks' hosted model registry is searchable and supports user discovery and access to stored models. Databricks provides model discovery and search functionality through interfaces and programmatic mechanisms that allow users to locate registered models and model versions, including by searching for registered models and model versions and returning lists of models responsive to search inputs, and then access a selected stored model record.

60.     Databricks provides model evaluation functionality, including the ability to evaluate trained models against historical datasets and to calculate and log performance metrics, including accuracy and related metrics, associated with particular models, model versions, and/or training runs. Databricks' evaluation workflows calculate model accuracy against historical data in the manner recited by the '977 Patent, including through mechanisms that record and make

available accuracy metrics for evaluation and comparison of predictive models, and present or log those results to enable comparison across model runs and versions.

61.    Databricks' infringement of at least Claim 1 of the '977 Patent by the Accused Products and Services is illustrated by Plaintiff's claim chart, which will be provided as **Exhibit C** to this Complaint.

### B.    Unity Catalog Permissioning and Controlled Access

62.    Databricks has infringed and continues to infringe the '090 Patent in violation of 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or providing within the United States, including in Texas and this District, the Accused Products and Services, which implement and perform methods that practice one or more claims of the '090 Patent, including at least Claim 1, either alone and/or in concert with its customers and end users through the operation of Databricks' platform.

63.    Databricks stores a plurality of predictive models in its model management systems, including the hosted model registry and Models in Unity Catalog, and those models are of the type that produce predictions of the likelihood of an event occurring in the future. Unity Catalog provides governance and access control for objects on the Databricks platform, including model objects stored in the model registry. Databricks associates model records with permission levels and access rights that control user access to particular models and model versions.

64.    Databricks provides interfaces and workflows that receive search queries to search the database of stored models. Databricks receives user-entered and/or programmatic search inputs to search for registered models and model versions in the hosted model registry and/or Models in Unity Catalog —whether through its Catalog Explorer user interface, via

search APIs, or any other programmatic or user-facing mechanism for locating registered models and model versions.

65.    Databricks executes those search queries to produce search results that are provided based on search terms included in the search query and sends the resulting search results to the user system. Databricks returns lists of matching model records and model versions through its user interfaces and/or APIs in response to model search queries.

66.    Databricks provides interfaces and workflows that receive a user selection of a model from among the presented search results. After a user selects a model record or model version, Databricks processes that selection and retrieves and presents the selected model's details, subject to the permissions associated with that model.

67.    Databricks then sends a rights-conditioned message based on the access rights associated with the selected model, including at least one option enabling access to the selected model. Databricks conditions what message and enabling option is presented to the user based on the user's permissions and applicable access controls, including through Unity Catalog governance and controlled-access workflows. Databricks Marketplace implements a rights-conditioned access workflow in which a user selects a listing and the system sends a message based on the access rights associated with the selected model, including at least one option enabling access (such as request and/or subscription flows) to the selected model.

68.    Databricks Marketplace includes listings for predictive models and model-based AI assets configured to perform inference and generate predictions regarding future events based on input data. Such listings correspond to governed predictive models stored in Databricks' model registry and Unity Catalog, and are not limited to static datasets or passive content

69.     Databricks' infringement of at least Claim 1 of the '090 Patent by the Accused Products and Services is illustrated by Plaintiff's claim chart, which will be provided as **Exhibit D** to this Complaint.

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 8,160,977

70.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

71.     Plaintiff has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products or services that embody the inventions of the '977 Patent.

72.     Defendant directly infringed and continues to directly infringe at least Claim 1 of the '977 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271(a), by making, using, offering to sell, selling, and/or providing within the United States, including in Texas and this District, products and services that satisfy each and every limitation of one or more claims of the '977 Patent. These products and services include, at least, the Accused Products and Services.

73.     For example, Defendant directly infringed at least Claim 1 of the '977 Patent through operation of the Accused Products and Services, which (among other things) (i) create and store feature datasets used as precursor data for building predictive models, (ii) train predictive models using the stored precursor data, with the models generating probability-based predictions of future events, (iii) register and store trained models and model versions in a searchable model registry, (iv) enable users to search for and access stored models, and (v) evaluate predictive models against historical data, including calculating and logging model accuracy and related performance metrics.

74.     The accused components and functionality within the Accused Products and Services are material to the inventions of the '977 Patent and are especially made or adapted for use in infringement of the '977 Patent. On information and belief, these accused components and

functionality are not staple articles or commodities of commerce and have no substantial non-infringing uses.

75.    Defendant indirectly infringed one or more claims of the '977 Patent by knowingly and intentionally inducing others, including Databricks customers and end users, to directly infringe, either literally or under the doctrine of equivalents, by using the Accused Products and Services in an infringing manner.

76.    Defendant has indirectly infringed one or more claims of the '977 Patent, as provided by 35 U.S.C. § 271(b), by inducing infringement by others, including Defendant's customers and end users, in this District and elsewhere in the United States. Defendant induced this direct infringement through its affirmative acts of providing the Accused Products and Services and providing instructions, documentation, training materials, marketing, and technical support that encourage and instruct customers and end users to use the Accused Products and Services in an infringing manner.

77.    Defendant indirectly infringed one or more claims of the '977 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, including customers and end users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling, offering to sell, and providing the Accused Products and Services contribute to others' infringing use of those products and services. On information and belief, the accused components and functionality are material to the inventions of the '977 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and were known by Defendant to be especially made or adapted for use in infringement of the '977 Patent.

78.    At minimum, Defendant has been on notice of the '977 Patent and the infringement alleged herein as of the filing and service of this Complaint, and Defendant's continuing infringement has been willful.

79.    Plaintiff has been injured and seeks damages to adequately compensate it for Defendant's infringement of the '977 Patent. Such damages should be no less than a reasonable royalty under 35 U.S.C. § 284.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 9,009,090

80.    Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

81.    Plaintiff has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products or services that embody the inventions of the '090 Patent.

82.    Defendant directly infringed and continues to directly infringe at least Claim 1 of the '090 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271(a), by making, using, offering to sell, selling, and/or providing within the United States, including in Texas and this District, products and services that satisfy each and every limitation of one or more claims of the '090 Patent. These products and services include, at least, the Accused Products and Services.

83.    For example, Defendant directly infringed at least Claim 1 of the '090 Patent through operation of the Accused Products and Services, which (among other things) store a plurality of predictive models in a database with permission levels and access rights that control user access; receive and execute search queries to search for stored models and to produce search results based on search terms; send the search results to a user system; receive a user selection of a model from among the search results; and then send a rights-conditioned message based on the access rights associated with the selected model, including at least one option enabling access to the selected model.

84.     The accused components and functionality within the Accused Products and Services are material to the inventions of the '090 Patent and are especially made or adapted for use in infringement of the '090 Patent. On information and belief, these accused components and functionality are not staple articles or commodities of commerce and have no substantial non-infringing uses.

85.     Defendant indirectly infringed one or more claims of the '090 Patent by knowingly and intentionally inducing others, including Databricks customers and end users, to directly infringe, either literally or under the doctrine of equivalents, by using the Accused Products and Services in an infringing manner.

86.     Defendant has indirectly infringed one or more claims of the '090 Patent, as provided by 35 U.S.C. § 271(b), by inducing infringement by others, including Defendant's customers and end users, in this District and elsewhere in the United States. Defendant induced this direct infringement through its affirmative acts of providing the Accused Products and Services and providing instructions, documentation, training materials, marketing, and technical support that encourage and instruct customers and end users to use the Accused Products and Services in an infringing manner.

87.     Defendant indirectly infringed one or more claims of the '090 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, including customers and end users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling, offering to sell, and providing the Accused Products and Services contribute to others' infringing use of those products and services. On information and belief, the accused components and functionality are material to the inventions of the '090 Patent, are not staple

articles or commodities of commerce, have no substantial non-infringing uses, and were known by Defendant to be especially made or adapted for use in infringement of the '090 Patent.

88.    At minimum, Defendant has been on notice of the '090 Patent and the infringement alleged herein as of the filing and service of this Complaint, and Defendant's continuing infringement has been willful.

89.    Plaintiff has been injured and seeks damages to adequately compensate it for Defendant's infringement of the '090 Patent. Such damages should be no less than a reasonable royalty under 35 U.S.C. § 284.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial of all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff POULIN HOLDINGS, LLC prays for relief against Defendant Databricks, Inc., as follows:

a.    Entry of judgment declaring that Defendant has directly and/or indirectly infringed one or more claims of the Patents-in-Suit;

b.    An order awarding damages sufficient to compensate Plaintiff for Defendant's infringement of the Patents-in-Suit, but in no event less than a reasonable royalty, including supplemental damages post-verdict, together with pre-judgment and post-judgment interest and costs;

c.    Entry of judgment declaring that Defendant's infringement of the Patents-in-Suit has been willful, and awarding Plaintiff enhanced damages pursuant to 35 U.S.C. § 284;

d.    Entry of judgment declaring that this case is exceptional and awarding Plaintiff its costs and reasonable attorney fees pursuant to 35 U.S.C. § 285;

e.    An accounting for acts of infringement;

f.    Such other equitable relief which may be requested and to which the Plaintiff is entitled; and

g.    Such other and further relief as the Court deems just and proper.

Dated: March 10, 2026                    Respectfully submitted,

*/s/David L. Hecht*
David L. Hecht  (TX Bar No. 24136516)
dhecht@hechtpartners.com
HECHT PARTNERS LLP
111 Congress Avenue, Suite 500
Austin, Texas 78701
Telephone: (212) 851-6821

*Counsel for Plaintiff Poulin Holdings, LLC*